UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,                    Court File No. 14-cr-136 (JRT/LIB) (1)

          Plaintiff,

v.                                            **REPORT AND RECOMMENDATION**

Shane Wallace May,

          Defendant.

---

This matter came before the undersigned United States Magistrate Judge upon Defendant Shane Wallace May's pretrial discovery motions and Motion to Suppress Statements, [Docket No. 24]. This case has been referred to the undersigned Magistrate Judge for a report and recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a motions hearing on September 3, 2014, regarding Defendant's pretrial discovery motions and Motion to Suppress Statements, [Docket No. 24].[1]

At the motions hearing, the parties requested additional time to submit briefs regarding Defendant's Motion to Suppress Statements, [Docket No. 24]. The Court allowed Defendant until October 6, 2014, to file his brief in support of the motion, and the Government until October 14, 2014, to file a responsive brief in opposition to the motion. The Court took Defendant's Motion to Suppress Statements under advisement on October 14, 2014.

For the reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Statements, [Docket No. 24], be **DENIED**.

---

[1] The Court addressed Defendant's pretrial discovery motions by separate order, [Docket No. 46].

## I.    BACKGROUND AND STATEMENT OF FACTS

### A.    Background

Defendant Shane Wallace May ("Defendant") is charged in the present case with one count of aggravated sexual abuse, in violation of 18 U.S.C. §§ 1151, 1153(a), 2241(a)(1), and 2246(2)(a).  (Indictment [Docket No. 1]).

### B.    Facts[2]

The record presently before the Court indicates that, on June 7, 2013, Defendant was arrested on allegations that he had sexually assaulted a woman on the Red Lake Indian Reservation. That same day, Federal Bureau of Investigation Special Agent Joe Ogden ("SA Ogden") and Red Lake Police Department Criminal Investigator Geoffrey Pierre ("CI Pierre") attempted to interview Defendant at the Red Lake Criminal Justice Center. The room in which the officers met with Defendant was 12' by 8' and was occupied by two folding tables that had been pushed together, with two chairs on one side of the joined table and two chairs on the opposite side.  After the officers introduced themselves but before they could inform Defendant of his Miranda rights, Defendant began talking excitedly for several minutes about subjects unrelated to the present matter. Immediately upon finishing speaking, Defendant asked for a lawyer. At that point, SA Ogden and CI Pierre terminated the interrogation.

Defendant was subsequently charged with sexual assault in violation of Red Lake statutes and detained at the Red Lake Detention Center.  The Red Lake Tribal Court appointed Defendant an advocate from the Red Lake Tribal Defender's Office, who represented him in the tribal proceedings. Defendant was released from detention on December 12, 2013.

---

[2]Except where specifically indicated as being derived from Government's Exhibit 1, the recording of the May 14, 2014, interview of Defendant, the facts are derived from the testimony of Red Lake Police Department Criminal Investigator Geoffrey Pierre.

While the tribal case was still active, the Government charged Defendant with violating federal statutes in relation to the same incident that had been the basis of the tribal charge. A federal arrest warrant was issued. On May 14, 2014, CI Pierre, working with federal officers, identified Defendant at a softball field in Bemidji, Minnesota. The federal officers arrested Defendant and transported him to the Beltrami County Jail.  Despite the active status of the tribal case against Defendant and Defendant being represented in the tribal case by an advocate of the Red Lake Tribal Defender's Office, neither the arresting officers nor CI Pierre notified the advocate representing Defendant in the tribal case or contacted the Red Lake Tribal Defender's Office to inform them that Defendant had been arrested.

While Defendant was being transported to the Beltrami County Jail, Special Agent Robert Fraik ("SA Fraik") called CI Pierre to ask him to assist with interviewing Defendant. Later that same day, SA Fraik and CI Pierre interviewed Defendant in a room at the Beltrami County Jail. The room was 8' by 8' and contained a single small table and chairs at which Defendant and the officers sat. CI Pierre, who had been called in while off duty, was not in uniform and was not carrying his weapon or handcuffs.[3]  To CI Pierre, Defendant did not appear to be under the influence of alcohol during the interview. CI Pierre noted that Defendant was responsive and coherent and believed that Defendant understood what was being said during the interview. Neither CI Pierre nor SA Fraik threatened Defendant at any point during the interview.

SA Fraik began the interview by reading Defendant his Miranda rights. After being read those rights, Defendant asked what kind of questions the officers would be asking, indicating that he only wanted to answer certain kinds of questions. (Gov't Ex. 1). SA Fraik responded by

---

[3]There is no indication in the record presently before the Court whether SA Fraik was armed or displaying handcuffs.

telling Defendant that Defendant could choose not to respond to any given question and could stop answering at any time. (Id.). Defendant then read and signed a form indicating that he had been read his Miranda rights, understood those rights, and was willing to answers the officers' questions without a lawyer present. (Id.).

After Defendant signed the Miranda waiver form, SA Fraik asked Defendant to provide Defendant's version of the events leading to the charge against him. (Id.). Defendant began to describe, in a narrative fashion, aspects of the evening on which the alleged sexual abuse had occurred, including a description of how the alleged victim, in the company of a group of others, had arrived at the apartment in which Defendant had been staying. (Id.). SA Fraik then began asking Defendant clarifying questions about Defendant's statements, including asking him to identify the individuals who had been at the apartment that night. (Id.). Defendant answered SA Fraik's questions. (Id.). At that point, approximately sixteen minutes into the interview, the following exchange occurred:

SA Fraik:       Alright, I think I'm up to speed. I'll let you talk again.

Defendant:      Alright. Just … umm … I don't know . . . just like I said  . . . just basically  . . . just . . . just . . . ended up drinking and we were together whatever . . . um. Like I don't know like . . . see that's why I want to like stop it, 'cause I don't want to go get into like too much, like . . . because there's already . . . there's already her story. You know what I'm saying? And then like I ain't, I ain't gonna tell mine without . . . I ain't gonna tell my story without my lawyer on that part.  I would love to answer that shit.

SA Fraik:       Okay.

Defendant:      And um, if you've got any questions left for me, please ask.

The officers then inquired about Defendant's relationship with the alleged victim prior to the alleged sexual abuse. (Id.). Defendant acknowledged that he had known the alleged victim

for a short time and had been interested in her. (Id.).   Approximately seventeen minutes and thirty seconds into the interview, the following exchange occurred:

CI Pierre.       You never had sexual relations with her or anything like that?

Defendant:      No, no…

CI Pierre:       Ever?

Defendant:      Ever? No . . . even that um . . . Like um, like what are you talking about? Like prior to that night?

CI Pierre:       Well, any time.  Any time.  Did you have sex with her that night or . . . before?  Whatever.

Defendant:      Like, what do you mean? Like…

CI Pierre:       Well, yeah.  That night. That prior to, did you guys ever have [unintelligible] . . .

Defendant:      No, no. Well, like we talked or whatever or whatever like beforehand.  But um … like um… See that's why I want I want my lawyer here. 'Cause I don't want to make any further whatever, but um. . .

SA Fraik:       Shane, up to this point are you still comfortable speaking to us about it.  You mentioned an attorney now twice.

Defendant:      Yeah, yeah…yeah.

SA Fraik:       Is it okay that you're still talking? Or do you…

Defendant:      Yeah, yeah… I just… I'm real uncomfortable talking about this um…this is like…and it's hot in here and shit.

SA Fraik:       Okay. I just want to remind you that we're truly here to get your side of the story.

Defendant:      Like yeah, I see, 'cause I understand like . . . I understand what it is. I understand you guys are trying to build a case around me.  Tryin'.  You know what I'm saying? Like, I understand that.  Like . . . um, but I want to like, I want to help myself out. 'cause, I don't want to like, I don't want . . . I don't want to put myself in here like and people will be coming up to me like oh it's a motherfucking perv.  You know what I'm saying? It's [unintelligible] You know what I'm saying? . . .

SA Fraik:       Shane you need, you need to understand that I'm a fact gatherer in this case.  I don't have any work into it. I have ten minutes sitting at the softball field just

waiting for you to show up to arrest on a warrant as part of my job. I don't have any stake in here. I'm not trying to build a case. You know if . . . if you don't want to tell us anything further about it tonight, you don't have to beat around about it. If you want to tell me your side of the story, I would like to hear it. I'm going to write it down and it's going to be recorded. It . . . it's really your call. But, you know, I don't want you to, I don't want you to sit here and lie to me if you're going to talk to me, I'd appreciate…

Defendant:       Yeah, yeah. That's what I'm saying. That's what I'm saying…

SA Fraik:        Okay.

Defendant.       . . .'cause I don't want to go into anything further like without my lawyer here.

SA Fraik:        Okay.

Defendant:       Like that's what I'm saying. That's why I'm talking in the first place. Because I want, I want people to know like the actual truth. Like I didn't go over there and try to … you know what I mean… whatever. But um . . . at the same time, like, one of my main concerns is like, is like . . . she's accusing me of all of this. Right. And like, she can . . . [Defendant continued to make comments about the alleged victim and historic events that occurred at the place where the sexual abuse is alleged to have occurred for approximately an additional sixty seconds].

The officers resumed questioning Defendant, who went on describe in greater detail the events of the night in question. (Id.). Thirty-one minutes into the interview, Defendant began to describe his encounter with the alleged victim. (Id.). Approximately, forty-five seconds later, Defendant paused and the following exchange occurred:

Defendant:       And um . . . and I don't know like um . . . I don't know man. I need my lawyer to answer, to give you the full … full details and shit. [unintelligible] I don't feel comfortable like, I don't want to talk about it.

SA Fraik:        So . . . so . . . basically up to the point where she started coming on to you. You don't feel comfortable talking after that.

Defendant:       Yeah.

SA Fraik:        Okay. Um. Back up before that. Did she uh… did you guys have any discussion? Did you ask her about her having any STDs or anything like that?

Defendant:    No.  No. That was just a rumor thing going on out there. And then I said … [Defendant continued speaking with the officers about the then current handling of the case].

The interview ultimately lasted approximately forty-seven (47) minutes.

Defendant was indicted with one count of aggravated sexual abuse. (Indictment [Docket No. 1]).  He then filed the present motion to suppress.

## II.    DEFENDANT'S MOTION TO SUPPRESS, [DOCKET NO. 24]

Defendant moves the Court for an Order suppressing the statements he made while being interviewed on June 7, 2013, at the Red Lake Detention Center, and on May 14, 2014, at the Beltrami County Jail.

### A. June 7, 2013, Interview

In Defendant's moving papers, Defendant generally asserted that the statements that he made during the June 7, 2013, interview should be suppressed because SA Ogden and CI Pierre had not read Defendant his Miranda rights at that interview.

#### 1.  Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)).  Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444).  "Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those

normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (quoting Rhode Island v. Innis, 446 U.S. 291, 300–01(1980)).

    2.  Analysis

In Defendant's brief in support of his motion, Defendant offers no legal argument as to why the statements he made at the June 7, 2013, interview should be suppressed.  As the moving party, Defendant bears the burden of proving that the evidence he seeks to have suppressed was obtained by unlawful means. United States v. Edwards, 563 F. Supp. 2d 977, 994 (D. Minn. 2008), aff'd sub nom United States v. Bowie, 618 F.3d 802 (8th Cir. 2010).  As such, the Court would be warranted in recommending that, to the extent the motion pertains to the statements Defendant made at the June 7, 2013, interview, Defendant's motion be summarily denied on the basis that Defendant has failed to meet his burden of production. United States v. Jones, No. 09-cr-260 (DWF/RLE), 2009 WL 4723341, at *4 (D. Minn. Dec. 2, 2009) (Erickson, C.M.J.) (citing United States v. Mims, 812 F.2d 1068, 1074 (8th Cir. 1987); United States v. Quiroz, 57 F. Supp. 2d 805, 822-23 (D. Minn. 1999) (Mason, M.J.), adopted by 57 F. Supp. 2d 805, 811 (D. Minn. 1999) (Kyle, J.)).

Nonetheless, in an abundance of caution, the Court addresses the merits of Defendant's general assertion that those statements should be suppressed under Miranda. Jones, No. 09-cr-260 (DWF/RLE), 2009 WL 4723341, at *4 (citing Edwards, 563 F. Supp. 2d at 995).  In order to be suppressed under Miranda, challenged statements must have been made while in custody and in response to interrogation.  United States v. Howard, 532 F.3d 755, 761 (8th Cir. 2008) (citing United States v. Chamberlain, 163 F.3d 499, 502 (8th Cir. 1998)).  It is undisputed that Defendant was in custody at the time of the June 7, 2013, interview.  Accordingly, the only

question presently before the Court with regard to the June 7, 2013, interview is whether the statements Defendant seeks to suppress were made in response to interrogation.

Defendant has not identified any specific statements from that interview that he seeks to suppress. Rather, Defendant asserts that all of his June 7, 2013, statements should be suppressed as the product of an interview that was unconstitutional.

However, the only statements that Defendant made during the June 7, 2013, interview were those he volunteered immediately after SA Ogden and CI Pierre had first simply introduced themselves. It is abundantly clear that the officers' mere act of identifying themselves did not constitute direct questioning. As to whether the officers' self-identification was the functional equivalent of interrogation, the Eighth Circuit has explained:

> Whether a particular statement constitutes an interrogation depends upon the circumstances of each case, but we generally do not find a mere factual statement to be an interrogation where it serves to inform the suspect as to the status of his case or the investigation into his activities. United States v. Wipf, 397 F.3d 677, 685 (8th Cir.2005) (holding that an officer's post-invocation statement that he wanted to tell the defendant "the situation, and explain the charges against him" does not amount to custodial interrogation); see also Arizona v. Roberson, 486 U.S. 675, 687, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988) (explaining that even after a suspect has requested counsel, police "are free to inform the suspect of the facts of a second investigation as long as such communication does not constitute interrogation").

Hull, 419 F.3d at 767. At most, the officers identifying themselves constituted mere factual statements informing Defendant of the identity of the individuals investigating Defendant's activities. As such, the officers' introductions cannot be fairly construed as the functional equivalent of interrogation.

For the foregoing reasons, the Court recommends that Defendant's Motion to Suppress Statements, [Docket No. 24], be **DENIED**, to the extent the motion seeks to suppress any statements Defendant made at the June 7, 2013, interview.

**B.  May 14, 2014, Interview**

Defendant also contends that the Court must suppress all or some of the statements Defendant made at the May 14, 2014, interview, arguing the interviewing officers violated his Fifth and Sixth Amendment rights to counsel by interrogating him without contacting his tribal court advocate or having his tribal court advocate present, and by not honoring his invocation of the right to counsel during the interview.

**1.  <u>Fifth Amendment</u>**

Defendant argues that, because he invoked his Fifth Amendment right to have counsel present during the earlier June 7, 2013, interview, the officers interviewing him on May 14, 2014, in the absence of counsel violated his Fifth Amendment rights.

a.  <u>Standard of Review</u>

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const., Amend. 5. To counteract the coercive pressure of custodial police interrogations, "<u>Miranda</u> announced that police officers must warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney." <u>Maryland v. Shatzer</u>, 559 U.S. 98, 103-04 (2010) (citing <u>Miranda</u>, 384 U.S. at 444). "After the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease." <u>Id.</u> (citing <u>Miranda</u>, 384 U.S. at 444).  In addition, "if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present. <u>Id.</u> (citing <u>Miranda</u>, 384 U.S. at 474).

A suspect's invocation during a custodial interrogation of the right to counsel extends to subsequent custodial interrogations. <u>See</u> <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981) ("[A]n accused . . . having expressed his desire to deal with the police only through counsel, is

not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."); Minnick v. Mississippi, 498 U.S. 146, 153 (1990) ("In our view, a fair reading of Edwards and subsequent cases demonstrates that we have interpreted the rule to bar police-initiated interrogation unless the accused has counsel with him at the time of questioning."). Under the Edwards rule, "a voluntary Miranda waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel." Shatzer, 559 U.S. at 105. "The rationale of Edwards is that once a suspect indicates that 'he is not capable of undergoing [custodial] questioning without advice of counsel,' 'any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect.'" Id. at 104-05 (quoting Arizona v. Roberson, 486 U.S. 675, 681 (1988)).

   b.  Analysis

   It is undisputed that Defendant invoked his Fifth Amendment right to have counsel present during the June 7, 2013, interview. Defendant argues that his invocation of the right to counsel at that earlier interview prohibited the officers under the Fifth Amendment and the Edwards rule from interviewing Defendant without counsel present eleven months later, on May 14, 2014.

   Once a suspect has invoked his right to have counsel present during an interrogation, the Edwards rule prohibits both further and subsequent custodial interrogation in the absence of counsel. Edwards, 451 U.S. at 484-85; Minnick, 498 U.S. at 153.  In Shatzer, however, the Supreme Court held that a break in custody and sufficient time for the suspect to purge himself

of any lingering coercive effects thereof terminates the Edwards presumption that, once a suspect

has invoked his Fifth Amendment right to counsel in a custodial interrogation, subsequent

interrogations in the absence of counsel are unlawful.  Id. at 108 ("The only logical endpoint of

Edwards disability is termination of Miranda custody and any of its lingering effects.").   The

Shatzer court explained:

> When . . . a suspect has been released from his pretrial custody and has returned
> to his normal life for some time before the later attempted interrogation, there is
> little reason to think that his change of heart regarding interrogation without
> counsel has been coerced. He has no longer been isolated. He has likely been able
> to seek advice from an attorney, family members, and friends.  And he knows
> from his earlier experience that he need only demand counsel to bring the
> interrogation to a halt; and that investigative custody does not last indefinitely. In
> these circumstances, it is far fetched to think that a police officer's asking the
> suspect whether he would like to waive his Miranda rights will any more "wear
> down the accused," Smith v. Illinois, 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d
> 488 (1984) (per curiam), than did the first such request at the original attempted
> interrogation—which is of course not deemed coercive. His change of heart is less
> likely attributable to "badgering" than it is to the fact that further deliberation in
> familiar surroundings has caused him to believe (rightly or wrongly) that
> cooperating with the investigation is in his interest.

Id. at 107-08.  Rejecting case-by-case determination of when a break in custody would purge a

suspect of the lingering pressures of custodial interrogation, the Supreme Court set forth a bright-

line rule that a break of custody lasting fourteen (14) days would be sufficient for a suspect to

"shake off any residual coercive effects of his prior custody." Id. at 100; see also United States v.

Hollister, No. 12-cr-13 (PJS/TNL), 2012 WL 4076170, at *4 (D. Minn. Sept. 14, 2012)

(discussing the Shatzer fourteen day rule but not applying it, concluding there had been no break

in custody).

   After Defendant invoked his right to have counsel present during the earlier June 7, 2013,

interview, the officers terminated that interview. Defendant was thereafter held in detention in

the Red Lake Criminal Detention Center until December 12, 2013.  The record presently before

the Court contains no indication that Defendant was detained at any time between December 12,

2013, and the date of the subsequent interview, May 14, 2014.  Under <u>Schatzer</u>, SA Fraik and CI

Pierre were not prohibited by the <u>Edwards</u> rule from interviewing Defendant on May 14, 2014,

in the absence of counsel. <u>See</u> <u>United States v. Guzman</u>, 603 F.3d 99, 106 (1st Cir. 2010)

(holding a break in custody of four months sufficient under <u>Schatzer</u>, to render the Edwards rule

inapplicable to a subsequent interrogation); <u>United States v. Verges</u>, 997 F. Supp. 2d 398, 408-09

(E.D. Va. 2014) (holding officers did not run afoul of the <u>Edwards</u> rule by initiating a subsequent

interrogation in the absence of counsel after a ten month break in custody far exceeding "the

fourteen-day period set out in <u>Shatzer</u>[.]").

**2.  Sixth Amendment**

Defendant next contends the officers violated his Sixth Amendment right to counsel by

interviewing him on May 14, 2014, in the absence of his tribal advocate, arguing that he had

been appointed a tribal advocate in the previous tribal court proceedings and whom Defendant

was entitled to have notified and present at the May 14, 2014, interview.

a.  <u>Standard of Review</u>

"[O]nce the adversary judicial process has been initiated, the Sixth Amendment

guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal

proceedings." <u>Montejo v. Louisiana</u>, 556 U.S. 778, 786 (2009) (citing <u>United States v. Wade</u>,

388 U.S. 218, 227–28 (1967); <u>Powell v. Alabama</u>, 287 U.S. 45, 57 (1932)).

A defendant may waive the Sixth Amendment right to counsel, provided that the waiver

is voluntary, knowing, and intelligent. <u>Id.</u> (citing <u>Patterson v. Illinois</u>, 487 U.S. 285, 292 n. 4,

(1988); <u>Brewer v. Williams</u>, 430 U.S. 387, 404 (1977); <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464

(1938)).

13

  b.  Analysis

Defendant contends that SA Fraik and CI Pierre violated his Sixth Amendment right to counsel by interviewing him on May 14, 2014, without his tribal advocate present, arguing: 1) the federal sexual abuse charge in the present case pertains to the same offense as the tribal sexual assault charge for purposes of the Sixth Amendment right to counsel[4]; 2) being represented by a tribal advocate from the Red Lake Tribal Defender's Office in the proceedings before the Red Lake Tribal Court was sufficient for the Sixth Amendment right to counsel to attach; and 3) the officers were not allowed to interview him in the absence of his tribal advocate.

The Government does not dispute that the federal complaint in the present case charged the same offense as the tribal complaint before the Red Lake Tribal Court. The parties dispute, however, whether Defendant's availing himself of the right to be represented in the Tribal Court by a lay advocate from the Red Lake Tribal Defender's Office was sufficient for the Sixth Amendment right to counsel to attach during the tribal proceedings. "There is, as a general proposition, no Sixth Amendment right to counsel in Indian Country as to tribal court matters. Such right is guaranteed by the Indian Civil Rights Act ("ICRA") (but only at the expense of the defendant)." United States v. Red Bird, 2001 DSD 15, 146 F. Supp. 2d 993, 997 (D.S.D. 2001) aff'd sub nom. United States v. Bird, 287 F.3d 709 (8th Cir. 2002); see also Bird, 287 F.3d at 713 ("The Bill of Rights and the Fourteenth Amendment . . . do not apply directly to tribes."). This

---

[4] The offense-specific "Sixth Amendment right to counsel attaches only to charged offenses," however, "the definition of an 'offense' is not necessarily limited to the four corners of a charging instrument." Texas v. Cobb, 532 U.S. 162, 172-73 (2001). "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Id. (citing Blockburger v. United States, 284 U.S. 299, 304 (1932)). "Accordingly, . . . when the Sixth Amendment right to counsel attaches, it does encompass offenses that, even if not formally charged, would be considered the same offense[.]" Id.; see also United States v. Bird, 287 F.3d 709, 715 (8th Cir. 2002) (holding federal and tribal complaints charged a single offense for purposes of the Sixth Amendment right to counsel where the federal and tribal charges required proof of identical essential elements).

Court has previously concluded that the Red Lake Tribal Court appointing a lay advocate to represent a defendant in tribal proceedings does not cause the Sixth Amendment right to counsel to attach. United States v. Strong, No. 14-cr-23 (RHK/LIB), [Docket No. 33], *5-6 (D. Minn. April 7, 2014) (Brisbois, M.J.), adopted by No. 14-CR-23 (RHK/LIB), [Docket No. 40] (D. Minn. April 30, 2014) (Kyle, J.)).

However, even assuming for the sake of argument that being represented in the tribal proceedings by an advocate was sufficient for Defendant's Sixth Amendment right to counsel in the federal proceedings to attach, the Court concludes that the officers were not barred from initiating contact with Defendant on May 14, 2014, without first notifying Defendant's appointed tribal advocate. "The defendant may waive the [Sixth Amendment counsel] right whether or not he is already represented by counsel; the decision to waive need not itself be counseled." Montejo, 556 U.S. at 786 (citing Michigan v. Harvey, 494 U.S. 344, 352–53 (1990)). A showing that a defendant was read his Miranda rights and agreed to waive those rights will typically suffice to show that the waiver was knowing, voluntary and intelligent, even though the Miranda rights have their basis in the Fifth Amendment. Id.; Buckingham v. Symmes, No. 11-cr-2489 (PJS/SER), 2013 WL 4781038, at *8 (D. Minn. Sept. 6, 2013) (J. Schiltz).

Defendant here knowingly, intelligently, and voluntarily waived the right to have counsel present at the outset of the May 14, 2014, interview. The only evidence presently before the Court indicates that Defendant was coherent and responsive when read the Miranda warnings on May 14, 2014, and that he understood those warnings, as evidenced by his signature on the waiver form. (Govt. Ex. 2). The Court has also reviewed the audio of the May 14, 2014, rights advisory given to Defendant by law enforcement in this case, and it too is entirely consistent with this conclusion. (Govt. Ex. 1). There is simply no basis in the record to conclude that

Defendant's <u>Miranda</u> waiver, as would subsequently allow SA Fraik and CI Pierre to question Defendant without counsel present, was anything other than knowing, intelligent, and voluntary.

### 3.  Invocation During Questioning

Finally, Defendant argues that, even if SA Fraik and CI Pierre did not violate his Fifth or Sixth Amendment rights to counsel by contacting him and initiating the interview on May 14, 2014, Defendant variously invoked his right to have counsel present during the interview. The Government contends that Defendant's statements about his lawyer were ambiguous, such that it was not clear that Defendant was invoking his right to have counsel present.  In the alternative, the Government contends that, even if Defendant did invoke his right to have counsel present during the interrogation, the invocation was limited to certain areas of discussion that subsequent questioning did not intrude upon.

#### a.  <u>Standard or Review</u>

Once a suspect knowingly, intelligently, and voluntarily "waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him." <u>Davis v. United States</u>, 512 U.S. 452, 458 (1994) (citing <u>North Carolina v. Butler</u>, 441 U.S. 369, 372–76 (1979)). "But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." <u>Id.</u> at 458-59 (citing <u>Edwards</u>, 451 U.S. at 484–85).

"Invocation of the <u>Miranda</u> right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" <u>Id.</u> at 459 (citing <u>McNeil</u>, 501 U.S. at 178).  "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," officers are not required

to cease questioning. Id.; United States v. Havlik, 710 F.3d 818, 821 (8th Cir. 2013). The test of whether a defendant has invoked his right to counsel is an objective one. Davis, 512 U.S. at 458-49.

In addition, a suspect in an interrogation may invoke a limited right to have counsel present only for certain actions or areas of questioning. See Connecticut v. Barrett, 479 U.S. 523, 529 (1987); United States v. Boyer, 914 F.2d 144, 146 (8th Cir. 1990) ("[A] limited invocation of the right to counsel does not preclude the admissibility of statements a defendant makes which fall outside the limited invocation.").

    b.  Equivocal Statement

Defendant contends that during the following exchange, which occurred approximately sixteen minutes into the interview, Defendant invoked his right to have counsel present during the interview:

Defendant       Just … umm … I don't know . . . just like I said  . . . just basically  . . . just
                . . . just . . . ended up drinking and we were together whatever . . . um.
                Like I don't know like . . . see that's why I want to like stop it, 'cause I
                don't want to go get into like too much, like . . . because there's already . .
                . there's already her story. You know what I'm saying? And then like I
                ain't . . . I ain't gonna tell mine without . . . *I ain't gonna tell my story
                without my lawyer on that part.*  I would love to answer that shit.

SA Fraik:       Okay.

Defendant:      *And um, if you've got any questions left for me, please ask.*

(Gov't. Ex. 1) (emphasis added).

In the present case, statements Defendant made at other points during the interview provide context for objectively assessing Defendant's foregoing statement during the sixteenth minute about a lawyer. At the very beginning of the interview, Defendant asked the officers what kind of questions they intended to ask and indicated that he wanted to answer only certain

17

kinds of questions. Although Defendant did not at that time mention a lawyer, the logical inference is that Defendant was willing to speak about certain topics but not others. That inference is further bolstered by additional statements Defendant made during the thirty-first minute of the interview when Defendant similarly said that he was comfortable discussing the events leading up to the alleged sexual abuse up to a certain point in time.

In addition, Defendant's statement during the sixteenth minute of the interview that he would not talk about "that part" without a lawyer is not itself an objectively unequivocal statement that he wanted all questioning to cease until he had a lawyer present. Tellingly, after Defendant indicated that he wanted his lawyer present before he would talk about "that part," Defendant immediately told the investigating officers that they could continue to ask other questions. Defendant's indication that the officers could continue asking him questions makes his reference to an attorney anything but an unequivocal request for all questioning to cease. Indeed, Defendant's statements in the minutes following that initial reference to a lawyer indicated that Defendant wanted to continue speaking to the officers. Accordingly, the officers did not violate Defendant's right to counsel by merely continuing to question him. See Davis, 512 U.S. at 459 ("If the statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect.").

However, although Defendant did not clearly, objectively, and unequivocally indicate that he wanted counsel present for all further questioning, Defendant did indicate that he would not talk to the officers about certain subjects without having counsel present. Defendant thus invoked a limited right to have counsel present before answering any questions regarding topics he was not comfortable discussing. See Barrett, 479 U.S. at 529 (holding scope of a defendant's right to counsel was limited where the defendant unambiguously stated limitations on the

circumstances in which he would not proceed without a lawyer).  Accordingly, the Court must determine whether any of the subsequent questioning by the officers intruded on the limited topics that Defendant did not want to discuss absent counsel or to which Defendant himself did not reinitiate discussion. See Boyer, 914 F.2d 144, 146 (8th Cir. 1990) ("[A] limited invocation of the right to counsel does not preclude the admissibility of statements a defendant makes which fall outside the limited invocation."); Edwards, 451 U.S. at 484-85 ("[A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation . . . unless the accused himself initiates further communication, exchanges, or conversations with the police.").  In his motion papers and supplemental briefing, Defendant did not point to any specific questions by the officers that intruded into the limited areas Defendant indicated he would not discuss without counsel present. The Court's independent review of the audio recording of the interview indicates that the officers carefully identified the scope of the topics Defendant would not discuss without having counsel present and framed their questions to address areas that Defendant had himself indicated he remained willing to discuss.  As such, the Court finds no basis to suppress statements made by the Defendant after he made a limited invocation of the right to counsel during the sixteenth minute of the May 14, 2014, interview.

In summary, because Defendant's invocation of the Fifth Amendment right to counsel during the June 7, 2013, interview did not extend to the May 14, 2014, interview, and because Defendant knowingly, intelligently, and voluntarily waived any right to counsel that might even arguably have attached as a result of the 2013 tribal court proceedings at the beginning of the May 14, 2014, interview, the officers did not violate any Fifth or Sixth Amendment right Defendant had to have counsel notified and present for the May 14, 2014, interview.  In addition, because Defendant did not objectively and unequivocally invoke a right to have all questioning

cease until counsel was present during the May 14, 2014, interview, and the officers did not subsequently ask questions about the limited areas Defendant said he would not talk about in the absence of counsel, the officers did not violate any limited right to counsel that arose after Defendant waived his <u>Miranda</u> rights at the initiation of the May 14, 2014, interview.

For the foregoing reasons, the Court recommends that Defendant's Motion to Suppress Statements, [Docket No. 24], be **DENIED** to the extent the motion pertains to any statements Defendant made at the May 14, 2104 interview.

## III.    CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements, [Docket No. 24], be **DENIED**.

Dated: October 31, 2014                                    s/Leo I. Brisbois
                                                                        Leo I. Brisbois
                                                                        U.S. MAGISTRATE JUDGE

## N O T I C E

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by November 14, 2014** a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections **by November 28, 2014**. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.